**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES NASH, | Case No. 1:12-CV-00694-AWI-SMS |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS RECOMMENDING THAT THE COURT AFFIRM DENIAL OF BENEFITS AND ORDER JUDGMENT FOR COMMISSIONER |
| v. | |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Charles Nash, by his attorney Sengthiene Bosavanh, seeks review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability insurance benefits (DIB) under Title II and supplemental security income (SSI) under Title XVI of the Social Security Act.[1] The matter is before the Court on the parties' cross-briefs, which were submitted, without oral argument, to the Honorable Sandra M. Snyder, United States Magistrate Judge. The undersigned finds the decision of the Administrative Law Judge ("ALJ") to be supported by substantial evidence in the record as a whole and based upon proper legal standards, and recommends that the Court affirm the Commissioner's denial of benefits.

**I.   Procedural History**

Plaintiff claims he has been disabled since May 12, 2008. On February 3, 2009, he applied for benefits, which the agency denied in June 2009 and upon reconsideration in September 2009. On October 18, 2010, Plaintiff appeared and testified before ALJ Daniel G. Heely. On November 17,

---

[1] Where the applicable DIB and SSI regulations are virtually identical, this opinion refers only to the DIB regulation.

1

2010, the ALJ denied Plaintiff's application. Because the Appeals Council denied review, the ALJ's decision is what the Court reviews on appeal.

## II.     Factual Record

### A.     Plaintiff's Background and Testimony

Plaintiff was born in 1951 and was 59 at the hearing. He graduated high school, and had some college and training in welding. AR 62. He was homeless and lived in his truck for about nine months since driving from Oklahoma to California to be closer to his family. AR 67-68. He reported no issues making the long-distance drive. AR 68-69. He was on food stamps and received free medical treatment. AR 69. He went to his daughter's house to shower. *Id*. He used the computer at her house and went to the library to "read and relax" and use the internet. AR 70. He occasionally attended church. AR 71. He followed a set route to collect and recycle bottles and cans. AR 69-70.

In his February 2009 function report, Plaintiff described his activities of daily living as follows: "I make breakfast, read, watch TV, draw, play my guitar, get some sun, lunch, dinner, TV—bedtime." AR 167. He did not need reminders to attend to his personal care or take medications. AR 169. He prepared his own meals, and had no physical difficulty with house and yard work. *Id*. He drove and went shopping on a weekly basis but got winded easily. AR 170. He checked boxes indicating that his condition affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, complete tasks, concentrate, and use his hands. AR 172. He reported that he followed instructions well. *Id*. He received free medical care after he was fired from his job. AR 140, 143, 174.

At the hearing, Plaintiff stated that he stopped work due to trouble with his right arm. AR 75. He stated that he suffered back pain due to arthritis and degenerative disc disease, a right shoulder tear in the rotator cuff, thoracic outlet syndrome, non-insulin dependent diabetes, and bilateral carpal tunnel syndrome. AR 63, 67, 74. He had edema in his lower extremities, treated with Lasix. AR 66, 78, 80. He stood 5'10'' tall and weighed 314 pounds. AR 64. He reported that treating physicians had not recommended any surgical intervention, diet or conditioning program. AR 63-64. He took Tylenol for pain. AR 72. He said his diabetes medication caused an irregular heartbeat. AR 65.

He also suffered from depression. AR 67, 69. He reported that he took Celexa for depression in the past, but stopped, and that he planned to return to therapy and considered switching

1  medications. AR 67. His depression worsened with the break in treatment associated with his move
2  from Oklahoma to California. AR 76. It caused short-term memory and concentration issues,
3  resulting in an inability to focus for more than 30 minutes. *Id*.

4  Plaintiff estimated he could use his right arm for 30 minutes, reaching, grasping, and
5  manipulating, followed by 60 to 90 minutes of rest. AR 74-75. Reaching made his arm numb. AR
6  81. He testified he could not raise his right arm, bent at the elbow, above 80 degrees. AR 81. He
7  could stand 15 minutes at a time and lift 10 to 15 pounds. AR 73. Depression caused deficits in
8  memory and concentration, which showed up at work losing track when doing multiple tasks. AR
9  77-78. He could focus mentally for 15 to 30 minutes. AR 76. He got winded easily walking. AR 80.
10 The Lasix for his edema made him need to urinate every 60 to 90 minutes. *Id*.

### B. Medical Record

Plaintiff's annual health certifications for the Oklahoma State Department of Education from 2006 and 2007 noted obesity and osteoarthritis, but stated that the associated chronic back pain was "not disabling." AR 195-96. Records dated 2007 and 2008 from treating physician Darrell Mease, M.D., diagnosed "single episode" depression and noted anxiety, stress, anhedonia, and sadness treated with Celexa and the instruction to "increase physical activity, contact a support group, avoid substance abuse, and resume social interaction." AR 223, 226, 230-36.

On February 12, 2008, Plaintiff underwent an exercise stress test, which showed "[n]ormal left ventricular systolic function before and following exercise with an estimated ejection fraction of 60%" and "[n]ormal color flow Doppler." AR 208. Dr. Mease ordered this test because Plaintiff reported irregular heartbeat and shortness of breath; however, the results of the test were "normal" with "no exercise limitations" recommended and no follow-up required. AR 226-28.

On April 10, 2008, Plaintiff presented at his treating physician's office, reporting shoulder pain, muscle aches, and numbness that initially started two years prior and was not precipitated by an obvious injury. AR 223. Plaintiff reported that non-steroidal anti-inflammatory drugs relieved his symptoms. AR 223. On April 16, 2008, imaging identified a "[r]otator cuff impingement with small anterior fiber supraspinatus tendon tear." AR 345. Subsequent imaging in August 2008 also identified thoracic outlet syndrome, which impacted Plaintiff's right shoulder. AR 297, 301.

On February 12, 2009, Plaintiff reported irregular heartbeats and shortness of breath. AR 293. His doctor prescribed Lasix to treat edema in his right leg. AR 293. February 19, 2009, echocardiogram showed normal findings (unchanged from the 2008 stress test). AR 295.

Records from Grand Lake Mental Health Center show that Plaintiff received counseling from Natasha Inlow from February 9 to June 29, 2009. AR 372-88. Based on Plaintiff's subjective reports, Ms. Inlow noted a Global Assessment of Functioning (GAF) score of 43. AR 379, 391. Plaintiff reported that "he had a lot of conflict with the high school principal [where he worked] as he was 'accusing me of not doing my job when I was' and using intimidation to get his point across." AR 373. During subsequent counseling, Plaintiff reported that he had lost his job "due to allegations of sexual misconduct" and that he had not been able to find a job since. AR 380, 388. Plaintiff also reported family estrangement and tensions related to his termination. AR 374. Plaintiff "agree[d] that his depressive symptoms may be situational" due to recent physical problems and job loss. AR 373.

On May 26, 2009, Beau Jennings, D.O., conducted a consultative physical examination. AR 346. In the personal history form, Plaintiff reported "slight pain" in his shoulder and arm. AR 356. He reported trouble emptying his bladder, but no issues with bladder control, trouble holding urine or frequent urination at night. AR 358. He had "good grip strength" and was able to "manipulate[] small objects well." AR 346. His pulses and reflexes were good except for the right knee, and he had "no joint deformities." AR 346. He exhibited normal gait and performed "squats well." AR 346. Dr. Jennings found "2+ pretibial edema to the upper one third of each tibia," but noted that "[s]traight leg raising test [was] negative. Calves and thighs [were] equal in circumference." AR 346. The medical imaging report found "moderate degenerative changes" in the right shoulder. AR 347. Dr. Jennings did not note any psychological impressions. AR 346.

State agency physician J. Marks-Snelling, D.O., completed a functional capacity assessment on June 16, 2009, which noted shoulder pain and obesity. AR 362-69. The doctor opined that Plaintiff could lift 50 pounds occasionally and 25 pounds frequently and could stand, walk, and sit for 6 hours in an 8-hour workday with normal breaks. AR 363.

Plaintiff's treatment notes from August to October 2009 noted benign hypertension, shortness of breath, low back pain, and obesity. AR 419-24, 471-74 (duplicate records). Plaintiff's

1  physician Richard Heck, M.D. "[d]iscussed the importance of weight loss" and prescribed daily low-
2  intensity exercise for at least 30 to 60 minutes. AR 420. Treatment notes assessed controlled diet and
3  uncomplicated diabetes. AR 424. Dr. Heck emphasized the need for continued weight loss efforts.
4  AR 424. Plaintiff reported no medication side effects. AR 181.

5  Subsequent to the agency's initial denial of Plaintiff's disability application, state agency
6  doctor Dorothy Millican-Wynn, Ph.D., completed a psychiatric review technique form in September
7  2009 regarding Plaintiff's new allegation of depression. AR 395. She noted an affective disorder and
8  anxiety-related disorder with mild limitations in activities of daily living and maintaining social
9  functioning; moderate difficulties in concentration, persistence, and pace; and no episodes of
10 decompensation. AR 396-412. She noted that Plaintiff's "condition does impose a severe impairment
11 mentally. However, claimant would be able to handle a job that is semi-skilled in nature. He did
12 mention some fear of public places, so the job should have only minor public interaction, although
13 he would be able to handle some public interaction." AR 408, 410-11. Plaintiff could "perform
14 simple and some complex tasks," "relate to others on a superficial work basis," "adapt to a work
15 situation," and "interact appropriately with the general public on a somewhat limited basis." AR 412.

16 Plaintiff sought treatment in 2010 at Golden Valley Health Center. AR 429-69. On March 30,
17 he presented with complaints of back pain and problems urinating. AR 464. He had intact recent and
18 remote memory and appropriate affect. *Id*. He exhibited a normal gait; had "no deformities,
19 misalignment or mass" in the cervical spine, which was "stable;" had "no tenderness;" and had
20 "normal flexion, extension, rotation and lateral bending." *Id*. The thoracic spine was "normal," "non-
21 tender to palpation," and had a "normal" range of motion. *Id*. The lumbar spine was "normal" and
22 "stable" with midline tenderness without spasm and "normal" range of motion. *Id*. On August 18,
23 Plaintiff reported an exacerbation of his depressive symptoms, was diagnosed with depressive
24 disorder, and started back on Celexa. AR 442. He was also instructed to "[i]nitiate daily exercise."
25 *Id*. On September 13, he reported that Celexa was "starting to work" and his physician described his
26 depression as "slightly better." AR 438.

27 On February 10, 2011, Plaintiff returned to Dr. Heck's office for medication refills. AR 475.
28 Dr. Heck noted bilateral edema 2+, uncomplicated diabetes, benign hypertension, unspecified

5

congestive heart failure, and obesity, without prescribing additional treatment. AR 475. Based on "clinical suspicion of heart disease," Plaintiff underwent multiple cardiac studies in October 2011. AR 479-88. A cardiac sinus rhythm test showed normal findings with "[n]o sustained dysrhythmias." AR 479-80. His echocardiogram showed "[n]ormal sinus rhythm" and "no evidence of [pericardium] effusion." AR 481-83. A cardiac stress test showed "[n]o stress induced chest pain" and "[n]o sustained arrhythmia," findings "essentially unchanged from baseline" with no evidence of ischemia or infarction. AR 484-86. A myocardial perfusion and function study showed "[n]o strong evidence of ischemia or infarction" and "[n]o significant wall motion abnormality." AR 487-88.

### C. Testimony of Vocational Expert

Susan T. Moranda, an impartial vocational expert, stated that Plaintiff had past relevant work as an electrical mechanical technician (medium, 7), janitor (medium, 3) and bus driver (medium, 3).[2] She then assumed a person of Plaintiff's age (57 on the alleged date of onset), education (at least high school), and work history, and testified to the work such a person could do given various assumptions about his residual functional capacity. *Cf.* 20 C.F.R. §404.1560(c)(1).

The first hypothetical person could sit six hours and stand and/or walk less than two hours in an eight-hour workday; could lift and carry less than ten pounds occasionally; could never climb, balance, stoop, kneel, crouch, crawl, or work around hazards; would need numerous unscheduled rest breaks; and could not concentrate on simple, routine tasks. The vocational expert testified that this person could not do any work. The second hypothetical person could do medium work and could not concentrate on simple, routine tasks. She testified that this person could not do Plaintiff's past work, but could do jobs including landscape assistant (22,000 jobs in California), hand packager (200,000 jobs in California), and auto wash person or auto detailer (10,000 jobs in California). The third hypothetical person could do medium work. This person could do Plaintiff's past work.

### III. Disability Standard

To be disabled, a claimant must have a medical impairment or impairments capable of lasting at least twelve months, and these must be so severe that he can engage in neither his past work nor,

---

[2] In the parenthetical after the job title, the strength rating captures how much exertion the job requires and whether this is occasional (up to a third of a day), frequent (two thirds), or constant. The Specific Vocational Preparation number ranks, from one to nine, how long it takes to learn the job. Dictionary of Occupational Titles (4th ed.1991) Appendix C.

in light of his vocational limitations, in any work existing in significant numbers in the national economy. 42 U.S.C. § 1382c(a)(3). The claimant has the burden of proof, except that the Commissioner must prove the number of jobs in the economy. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). He will be found disabled either if he satisfies all the elements of this definition or if his condition is defined as disabling under the Commissioner's "listings." *See* 20 C.F.R. 404.1520, SSR 85-28. For administrative purposes, the Commissioner prescribes the order in which the ALJ considers these factors, and instructs the ALJ to end his inquiry as soon as he reaches a dispositive finding, either in that the claimant fails to satisfy an element of disability or in that he is disabled by definition. *See* 20 C.F.R. 404.1594(b)(5) (sequence promotes uniformity, efficiency, neutrality, and careful documentation); *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 804 (1999) (sequence embodies "presumptions about disabilities, job availability, and their interrelation" which "grow out of the need to administer a large benefits system efficiently").

**IV.     The ALJ's Decision**

This inquiry has five steps, which the ALJ considered in turn. *See* 20 C.F.R. § 404.1520. First, Plaintiff was not doing gainful work. Second, he showed he had severe impairments meeting the durational requirement of twelve months. These included obesity and osteoarthritis, though not diabetes or depression. Third, his impairments were not disabling under a "listing."

The ALJ then considered Plaintiff's residual functional capacity ("RFC") and determined that he could do medium work, as described by state agency non-examining physician Marks-Snelling, D.O. These limitations corresponded to the third hypothetical considered by the vocational expert, which supported a finding at step four that Plaintiff could do all his past relevant work. Alternatively, if Plaintiff also could not focus on simple, routine tasks, then his limitations corresponded to the second hypothetical, and at step five he could do a significant number of other jobs in the economy. Under either alternative, he was not disabled.

On appeal, Plaintiff argues that the ALJ erred at step two by omitting depression as a severe impairment. Plaintiff also argues that the ALJ gave insufficient reasons for rejecting Plaintiff's alleged urinary frequency as a limitation and improperly considered his obesity.[3]

---

[3] Plaintiff also asserts that "[c]learly, with his constellation of impairments, Plaintiff could not perform more than light

7

## V. Discussion

### A. Scope of Review

Congress has provided a limited scope of judicial review of a decision to deny benefits under the Act. This Court may review only whether the decision applied the proper legal standards and made findings supported by substantial evidence. *Bray v. Comm'r*, 554 F.3d 1219 (9th Cir. 2009). Substantial evidence is more than a scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id*. Where the record as a whole can support either a grant or denial, the Court may not substitute its judgment. *Id*.

### B. Failure, If Any, to Identify Depression as a Severe Impairment Was Necessarily Harmless

Plaintiff argues that the ALJ erred by not including depression among the severe impairments identified at step two. However, even assuming this was error, it was harmless by definition. The most a claimant can accomplish at step two is to not have his case dismissed for failure to establish a single severe impairment. The existence of other severe impairments is immaterial at this step.

Under the regulations, the procedure at step two is as follows:

> At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. … If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled.
>
> 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c)

Thus, at step two, a claimant can only be prejudiced by a finding that he has no severe impairments at all. Otherwise, he succeeds and advances to the next steps. Critically, none of these later steps makes use of the step two finding. Instead, the ALJ must consider all of Plaintiff's limitations, again and in even further depth. *See Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1233 (9th Cir. 2011) (at step three, ALJ must consider "the combined effect of [Plaintiff's] limitations, both severe

---

work." Because the ALJ's reliance upon the opinion of non-examining physician Dr. Marks-Snelling was supported by the evidence of Plaintiff's daily activities and other medical evidence and was uncontradicted by any other medical opinion, and because Plaintiff offers no factual or legal basis to support this assertion, the ALJ's finding was not in error.

and non-severe," to determine whether they meet or equal a listing); 20 CFR 404.1545(e) ("we will consider the limiting effects of all your impairment(s), even those that are not severe, in determining your residual functional capacity" for use at steps four and five). In other words, the impairments identified at step two are not intended to be a comprehensive survey. Step two is simply "a *de minimis* screening device to dispose of groundless claims." *Smolen v. Chater,* 80 F.3d 1273, 1290 (9th Cir.1996).

This conclusion follows from *Burch v. Barnhart*, 400 F.3d 676 (9th Cir. 2005). There, the appellant claimed that the ALJ committed reversible error by not considering her obesity at step two. The court held that, even if this was error, it was harmless: The appellant gave no reasons why her obesity was relevant at step three, and the ALJ properly considered her obesity at step five. Other courts in this Circuit have reached the same conclusion. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007); *Lee v. Astrue*, 472 F. App'x 553, 555 (9th Cir. 2012); *Ushakova v. Astrue*, 2:11-CV-01920 KJN, 2012 WL 4364278 (E.D. Cal. Sept. 21, 2012); *Nash v. Astrue*, EDCV 12-816 JC, 2012 WL 6700582 (C.D. Cal. Dec. 21, 2012). Although there are also cases that have characterized error at step two as "harmful," the harm in these cases consisted in the ALJ's failure to later consider the effects of the additional impairment at steps three, four, or five. *See Smolen v. Chater*, 80 F.3d 1273, 1289-92 (9th Cir. 1996); *Hubble v. Colvin*, C12-876-JCC-JPD, 2013 WL 1703366 (W.D. Wash. Mar. 29, 2013); *Haycox v. Astrue*, C10-29-JCC-JPD, 2010 WL 4286129 (W.D. Wash. Sept. 8, 2010); *Petersen v. Barnhart*, 213 F. App'x 600, 605 (9th Cir. 2006); *Ormberg v. Astrue*, 254 F. App'x 589, 591 (9th Cir. 2007). Given that step two is "a *de minimis* screening device," and given that subsequent steps impose an independent obligation to consider all impairments—severe and non-severe, singly and in combination—these cases support the view that the omission of an impairment at step two can only be harmful if it persists at these latter steps.

As a consequence, it is fruitless of Plaintiff to argue that the ALJ omitted his depression at step two without also arguing that the ALJ failed to consider it at step three or address it in his RFC. *Burch* at 682. Nevertheless, the Court concludes, without the benefit of substantial briefing by Plaintiff, that substantial evidence supported the finding that Plaintiff's mental limitations were not severe, or alternatively that they merely caused an inability to focus on simple, routine tasks.

Significantly, no treating doctor diagnosed any mental functional limitations. Plaintiff's treatment notes from 2007 through 2008 from Dr. Mease noted that Plaintiff's depression was treated with Celexa. AR 223, 226, 230-36. Dr. Mease also instructed Plaintiff to "increase physical activity, contact a support group, avoid substance abuse, and resume social interaction." AR 223, 226, 230-36. Although Plaintiff received mental health counseling from Grand Lake from February 9 to June 29, 2009, AR 372-88, none of the counselors recorded objective mental examination findings sufficient to support Plaintiff's subjective allegations. They observed that Plaintiff had a "sad" mood and "intermittent" eye contact (e.g., AR 375-78), but these observations do not amount to the type of psychological examination and testing necessary to establish severe mental limitations. See 20 C.F.R. § 404.1521(b) (mental basic work activities include understanding, carrying out and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting); 404.1528 (describing signs and laboratory findings relevant to a mental impairment). Furthermore, none of these counselors are acceptable medical sources. 20 C.F.R § 404.1513(d)(1).

Grand Lake counseling records note that Plaintiff "agree[d] that his depressive symptoms may be situational"—i.e., related to his losing his job due to sexual misconduct. AR 373. Consistent with this notation, Dr. Mease diagnosed his depression as a "single episode." AR 232, 235. The ALJ noted Plaintiff's GAF score from Grand Lake, but observed that the score was based solely on Plaintiff's allegations and there was no associated testing or objective evaluation. AR 24, 379, 391. The fact that the counselors are not acceptable medical sources, combined with their failure to objectively document psychological limitations, neutralizes Plaintiff's argument that this evidence was material to the severity of his mental limitations. *See Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) (ALJ properly rejected two doctors' psychological assessment and diagnoses because they were based on the claimant's subjective statements and complaints and failed to review objective medical data); *Morgan v. Comm'r of Soc. Sec.*, 169 F.3d 595, 602 (9th Cir. 1999) (ALJ's rejection of treating psychologist's and psychiatrist's opinions upheld because a doctor's opinion "premised to a large extent upon the claimant's own accounts of his symptoms and limitations" may

be disregarded where those complaints have been "properly discounted"); SSR 06-3p (opinion from a medical source that is not an "acceptable medical source" should have objective support).

Plaintiff also asserts that Dr. Jennings, who conducted a consultative osteopathic examination, observed Plaintiff's mental affect. *See* Pl. Br. at 9. However, Dr. Jennings did not record any psychological impressions in his report. AR 346. Rather, the records Plaintiff cites are Dr. Mease's treatment notes, which Dr. Jennings merely attached to his report without endorsing or adopting any psychological findings contained therein. AR 353-54.

In her September 2009 psychiatric review technique form, Dr. Millican-Wynn noted that Plaintiff's "condition does impose a severe impairment mentally." However, she concluded that he "would be able to handle a job that is semi-skilled in nature" with "only minor public interaction, although he would be able to handle some public interaction." AR 408, 410-11. The ALJ addressed Dr. Millican-Wynn's conclusion, giving it reduced weight because it was inconsistent with other medical evidence and Plaintiff's statements, and because it noted that at Plaintiff's most recent counseling session, his counselor noted that he "was doing better and was focusing on the strengths in his life to help him manage his depression." AR 24, 377, 408. Moreover, a limitation on public contact does not impact Plaintiff's ability to do basic work activities. See 20 C.F.R. §§ 404.1521(b) (mental basic work activities include responding appropriately to supervision and co-workers).

As the ALJ also noted, Plaintiff stopped working because his employer terminated him as a school custodian for allegations of misconduct unrelated to his allegedly disabling impairments, namely having inappropriate behavior with a student. AR 24, 373, 380, 388; *Drouin v. Sullivan*, 966 F.2d 1255, 1256 (9th Cir. 1992) (symptom testimony properly rejected because claimant was laid off from work for reasons unrelated to her pain). Further, the ALJ noted that Plaintiff's reported daily activities demonstrated abilities that surpassed what he acknowledged and were inconsistent with the degree of impairment alleged. AR 24, 26 (noting that Plaintiff "drives, goes to parks and malls to collect and recycle cans and bottles, visits his daughter in another town and uses her computer, goes to the library, reads, occasionally attends religious services, and shops for groceries."). Because Plaintiff had no episodes of decompensation and his mental condition caused no more than "mild" limitations in his daily activities; social function; and ability to maintain concentration, persistence,

or pace, his depression was nonsevere. AR 25. Unlike the claimant in *Hill v. Astrue*, which Plaintiff cites, Plaintiff successfully obtained medical treatment and prescription medications. *See generally* 698 F.3d 1153 (9th Cir. 2012) (noting that because claimant, who lived in her car, had an inability to afford and secure medications, doctors expressed worry about maintaining treatment). Although Plaintiff reportedly discontinued therapy and prescription treatment temporarily because of his relocation from Oklahoma to California, within a month of reinstituting treatment he reported that Celexa was "starting to work" and his physician noted his depression was "slightly better." AR 438, 442. Indeed, at the November 2010 hearing, Plaintiff testified that although he no longer took Celexa, he did receive mental health treatment locally, and his doctors were managing his drug therapy. AR 26, 67; *see also* AR 140.

Finally, although the ALJ's RFC finding did not include any mental limitations, the ALJ did pose additional mental limitations to the vocational expert, who identified over 200,000 unskilled jobs Plaintiff still could perform. AR 83-84. The ALJ made an alternative finding at step five based on testimony that if Plaintiff were limited to simple, routine tasks, he could perform these additional alternative unskilled occupations. AR 28-29, 84. As such, even if Plaintiff were restricted to simple, routine tasks based on his alleged depression-related nonexertional limitations, there would still be a significant number of jobs he could obtain. See *Tommasetti v. Astrue*, 533 F.3d 1035, 1042 (9th Cir. 2008) (although the ALJ's determination at step four constituted error, it was harmless error in light of the ALJ's alternative finding at step five, where the ALJ concluded that the claimant could perform other work in the national and local economies that existed in significant numbers).

### C. **Substantial Evidence Supported the ALJ's Rejection of Plaintiff's Allegations of Urinary Frequency**

To determine a claimant's RFC, which is "the most [that a claimant] can still do despite [claimant's] limitations," an ALJ considers "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a). Plaintiff argues that the ALJ erred in rejecting his subjective claims regarding urinary frequency, specifically that he needed to urinate every 30 to 90 minutes. *See* Pl. Br. at 6-7. However, even Plaintiff notes that the ALJ summarized Plaintiff's testimony, including his statements regarding urinary frequency. AR 26. *See* Pl. Br. at 7. Since the ALJ determined that Plaintiff's

1 urinary frequency did not pose a functional limitation, he was not obligated to reflect it in the RFC
2 finding or in his hypothetical to the vocational expert.

3       Plaintiff characterizes his need to urinate as a "side effect" of Lasix, but cites only his own
4 testimony as proof. AR 80. Plaintiff's assertion that the Court can take "judicial notice" of
5 information on Wikipedia describing possible side effects of Lasix does not substitute for objective
6 record evidence documenting that Plaintiff actually had these side effects. Here, the record lacks any
7 medical evidence suggesting that Plaintiff experienced significant medication side effects, much less
8 side effects that were severe enough to impact his ability to work. *See Osenbrock v. Apfel*, 240 F.3d
9 1157, 1164 (9th Cir. 2001) (even "passing mentions of the side effects of medication in some of the
10 medical records" was insufficient evidence). None of the treatment records cited in Plaintiff's brief
11 show that he made such complaints to his doctors. *See* Pl. Br. at 6, citing AR 346, 420, 438-39, 454-
12 55, 471. At one point in these records, Plaintiff complained of acute (rather than chronic) dysuria
13 (AR 455), but this refers to painful—not frequent—urination. Absent "objective evidence"
14 documenting medication side effects, a claimant's "own subjective statements to [his] doctor and
15 [his] testimony at the hearing" are insufficient to establish that side effects exist. *Thomas v.*
16 *Barnhart*, 278 F.3d 948, 960 (9th Cir. 2002); *see also Bayliss*, 427 F.3d at 1217 (ALJ did not err in
17 failing "explicitly to address the drowsiness side-effect of [the claimant's] medication" when
18 assessing RFC as "the ALJ took into account those limitations for which there was record support
19 that did not depend on [claimant's] subjective complaints").

20       Plaintiff took Lasix since at least February 2009 but expressly reported no issues with
21 bladder control, trouble holding urine or frequent nighttime urination during his May 26, 2009,
22 consultative examination. AR 293, 358. Plaintiff made no mention of medication side effects or need
23 for frequent urination in his disability reports. AR 167-94; *see* AR 181 (listing "none" for side
24 effects associated with Plaintiff's Lasix use). The ALJ documented that no doctor assessed physical
25 limitations more restrictive than the RFC for the full range of medium work: "the record does not
26 contain any opinions from treating or examining physicians indicating that the claimant is disabled
27 or even has limitations greater than those determined by [Dr. Marks-Snelling]," who assessed a
28 medium-level work capacity. AR 27. Based on this substantial evidence, Plaintiff's urination

frequency did not pose a functional limitation. *See Greger v. Barnhart*, 464 F.3d 968, 973 (9th Cir. 2006) ("Greger[] claim[ed] that the Atenolol produced the side effect of fatigue. . . . Because Greger did not report any fatigue to his doctors during the relevant period, the ALJ properly limited the hypothetical to the medical assumptions supported by substantial evidence in the record.").

Even if Plaintiff needed to use the restroom outside the normal work breaks, he fails to show that this is a functional limitation. His past relevant janitorial work, which he is still capable of performing, required him to clean restrooms, refuting claims that the need to urinate would prohibit employment. AR 78, 160. *See* U.S. Dep't of Labor, OSHA, Standard Interpretations, Interpretation of 29 C.F.R. 1910.141(c)(1)(i): Toilet Facilities, (April 6, 1998) (noting that "[i]ndividuals vary significantly in the frequency with which they need to urinate" and that "[r]estrictions . . . may not cause extended delays").

### D. The ALJ Properly Considered Plaintiff's Obesity

Plaintiff states that the ALJ improperly considered the effects of his obesity. In fact, at step two, the ALJ found that Plaintiff had the severe impairments of obesity and osteoarthritis, and at later steps explicitly "considered the impact of the claimant's obesity on his other physical impairments." AR 23. The ALJ went on to discuss Plaintiff's non-insulin dependent, medication-controlled diabetes and depression, both of which were nonsevere. AR 24. The ALJ noted that Plaintiff had no limitations in his activities of daily living. *Id*.

In assessing Plaintiff's RFC, the ALJ noted Plaintiff's treating physician's explicit recommendation to engage in daily low-intensity sustained exercise for at least 30 to 60 minutes, noting that "this suggest[ed] the doctor was not concerned about any functional limitations." AR 27, 420; *see also* AR 226-28 ("no exercise limitations"), 442 ("[i]nitiate daily exercise"). Indeed, Plaintiff's weight has changed little—only 4 pounds—since his doctor certified him able to work as a janitor despite his obesity and osteoarthritis prior to his alleged disability onset. AR 64, 195. Further, the ALJ noted that Plaintiff's cardiac testing showed normal findings, including no evidence of ischemia or infarction, AR 27, 208, 226-28, 295, 479-88, and his diabetes was diet controlled. AR 27, 424. Testing performed as recently as October 2011 confirmed these cardiac findings. AR 484-86. Dr. Jennings also noted during his May 2009 consultative examination that Plaintiff exhibited a

normal gait and "squats well." AR 346. The ALJ expressly noted that no doctor opined that Plaintiff was incapable of performing the demands of medium work. AR 27.

Plaintiff's arguments to the contrary are highly speculative—arguing that Plaintiff's obesity "*could* reasonably affect the ability to sustain 2 hour work segments" and "*could* also exacerbate the alleged mental impairments"—without providing objective medical evidence to show that these limitations were something that Plaintiff actually experienced. *See* Pl. Br. at 8 (emphasis added). As "Social Security Ruling [02-1p] explains, each case should be evaluated *based on the record*." *Burch*, 400 F.3d at 683 (emphasis added). Just as in *Burch*, "[t]here was no evidence before the ALJ, and none in the record, which states that claimant's obesity limits [his] functioning." *Id.* "[Plaintiff] has not set forth, and there is no evidence in the record, of any functional limitations as a result of [his] obesity that the ALJ failed to consider." *Id.* at 684. A claimant bears the burden of proving disability, which Plaintiff has not met. *Id.* at 679.

## VI.   Conclusion

A review of applicable law and facts indicates that the ALJ applied appropriate legal standards and that substantial credible evidence supported the ALJ's determination that Plaintiff was not disabled. Accordingly, the undersigned recommends that the District Court affirm the Commissioner's determination.

These Findings and Recommendations will be submitted to the Honorable Anthony W. Ishii, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1). On or before **thirty (30) days** from the entry of this decision, any party may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Plaintiff is advised that, by failing to file objections within the specified time, he may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED.**

DATED:  5/24/2013                               /s/ SANDRA M. SNYDER
                                                UNITED STATES MAGISTRATE JUDGE